**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRENISE MCTYERE and LUCILLE CLARK,<br>individually and on behalf of a class of similarly situated persons,<br><br>                    Plaintiffs,<br><br>     v.<br><br>APPLE INC., a California company,<br><br>                  Defendant. | Case No. 1:21-cv-01133-LJV |

<u>**Plaintiffs' Memorandum of Law in Opposition to**</u>
<u>**Defendant's Motion to Dismiss Plaintiffs' Class Action Complaint**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

Introduction ......................................................................................................................... 1

Factual Background ............................................................................................................. 4

   I.   Defendant Misleads Consumers Into Believing That They Are Buying Digital Content ... 4

   II.   Defendant's Terms Do Not Cure Its Misleading Conduct............................................... 5

   III.   Plaintiffs Were Injured by Defendant's Deceptive Conduct........................................... 6

Legal Standard .................................................................................................................... 6

Argument ............................................................................................................................ 7

   I.   The Complaint is Sufficiently Pled................................................................................ 7

     A.   The Standard Applicable To Causes of Action under GBL §349 and §350 .................. 7

     B.   Apple Made Representations That Deceived Plaintiffs .................................... 8

     C.   The Terms Do Not Cure Apple's Deception.................................................... 13

     D.   Plaintiffs Have Pled An Injury ....................................................................... 17

   **II.**   **Plaitniff's Unjust Enrichment Claim is Allowed as Non-Duplicative** ........................... **21**

   **III.**   **Nonmutual Officensive Issue Preclusion** ..................................................................... **22**

   IV.   RULE 15 MANDATES THAT LEAVE TO REPLEAD SHOULD BE GIVEN FREELY ...................................................................................................................... 25

Conclusion ........................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

## <u>Cases</u>

*Ackerman v. Coca-Co*la,
 No. 09 CV 395(DLI)(RML), 2013 WL 7044866 (E.D.N.Y. July 18, 2013)............................ 7

*Acquard v. Big Heart Pet Brands Inc.*,
 2020 WL 12904361 (W.D.N.Y. Nov. 30, 2020) ............................................................ 21, 22

*Altman v. Bayer Co*rp.,
 125 F. Supp. 2d 666 (S.D.N.Y. 2000).......................................................................... 7

*Andino v. Apple, Inc.*,
 No. 2:20-cv-01628-JAM-AC, 2021 WL 1549667 (E.D. Cal. Apr. 20, 2021) .................. passim

*Ashcroft v. Iqbal*,
 556 U.S. 662, 129 S.Ct. 1937, 173 l.Ed.2d 868 (2009) ............................................ 7

*Axon v. Florida's Natural Growers*,
 813 F. App'x 701 (2d Cir. 2020) ............................................................................ 19

*Bell Altantic Corp. v. Twombly*,
 550 U.S. 544 (2007)........................................................................................ 7, 18

*Biflock v. Philip Morris USA, Inc.*,
 936 F.3d 74 (2d Cir. 2019)............................................................................ 22, 23, 24

*Campbell v. Whole Foods Market Grp.*,
 516 F. Supp. 3d 370 (S.D.N.Y. 2021)....................................................................... 6

*Chang v. Fage USA Dairy Industry, Inc.*,
 2016 WL 5415678 (E.D.N.Y. Sept. 28, 2016) ......................................................... 22

*Colella v. Atkins Nutritionals, Inc.*,
 348 F. Supp. 3d 120 (E.D.N.Y. 2018) .................................................................... 20

*Cty. of Nassau v. Expedia, Inc.*,
 992 N.Y.S.2d 293 (N.Y. App. Div. 2014) ............................................................... 21

*Foman v. Davis*,
 371 U.S. 178 (1962)....................................................................................... 25

*Goldemberg v. Johnson & Johnson Consumer Companies Inc.*,
 8 F. Supp. 3d 467 (S.D.N.Y. 2014) ...................................................................... 18

*Izquierdo v. Mondelez International Inc.*,
  No. 16-cv-04697, 2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016).......................................20, 21

*Kommer v. Bayer Consumer Health*,
  252 F. Supp. 3d 304 (S.D.N.Y. 2017).......................................................................................9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).....................................................................................................25

*Lynch v. City of New York*,
  952 F.3d 67 (2d Cir. 2020).........................................................................................................7

*Mason v. Reed's Inc.*,
  18-cv-10826 (JGK), 2021 WL 293326, at *4-5 (S.D.N.Y. Jan. 28 2021)...............................17

*Mantikas v. Kellogg Co.*,
  910 F.3d 633 (2d Cir. 2018)............................................................................................8, 13, 23

*McCracken v. Verisma Sys., Inc.*,
  No. 6:14-cv-06248-MAT, 2017 WL 2080279 (W.D.N.Y. May 15, 2017) .............................21

*Nietzke v. Williams*,
  490 U.S. 319 (1989)....................................................................................................................7

*Nuss v. Sabad*,
  No. 7:10-cv-0279-LEK-TWD, 2016 WL 4098606 (N.D.N.Y. July 28, 2016) .......................21

*Orlander v. Staples, Inc.*,
  802 F.3d 289 (2d Cir. 2015).....................................................................................................17

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, NA.*,
  85 N.Y.2d 20...............................................................................................................................8

*Pelman ex rel. Pelman v. McDonald's Corp.*,
  396 F.3d 508 (2d Cir. 2005).......................................................................................................8

*Pichardo v. Only What You Need, Inc.*,
  No. 20-cv- 493 (VEC), 2020 WL 6323775 (S.D.N.Y. Oct. 27, 2020) ...................................17

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019).....................................................................................................13

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
  843 F.3d 561 (2d Cir. 2016).......................................................................................................6

*Valcarcel v. Ahold U.S.A. Inc.*,
  No. 21-*cv-07821 (JSR) 2021 WL 6106209 (S.D.N.Y. Dec. 22, 2021)............................19, 20

*Warner v. StarKist Co.*,
    No. 1:18-cv-406-GLS-ATB, 2019 WL 1332573 (N.D.N.Y. Mar. 25, 2019).........................21

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011)........................................................................................25

**Statutes**

New York's General Business Law ("GBL") §§ 349 and 350...............................................passim

**Rules**

Fed. R. Civ. P. 8.........................................................................................................6, 8
Fed. R. Civ. P. 9.........................................................................................................6, 8
Fed. R. Civ. P. 15..........................................................................................................25

Plaintiffs Trenise McTyere and Lucille Clark respectfully submit this memorandum of law in opposition to Defendant Apple Inc.'s ("Apple") Motion to Dismiss ("Def. Mot.") Plaintiffs' Class Action Complaint ("Complaint" or "Comp.").

For the reasons set forth below, the Court should deny the Motion in its entirety.

## INTRODUCTION

Without any consumer surveys or even a single anecdotal experience from one of its tens of millions of customers, Apple summarily concludes in its motion papers that "no reasonable consumer acting reasonably under the circumstances" (Def. Mot. at 11) could ever be misled into believing that they purchased a movie, television show and/or music ("Digital Content"); even though consumers do so after clicking on a "Buy" button, and after doing so, the content is transferred into a "Purchased" folder. Apple takes this incredulous position despite the fact that (i) the court in *Andino v. Apple, Inc.*, No. 2:20-cv-01628-JAM-AC, 2021 WL 1549667, at *5 (E.D. Cal. Apr. 20, 2021), denied its motion to dismiss a complaint alleging claims virtually identical to the ones alleged here and (ii) the Complaint alleges that Apple has been on notice for years now that consumers have been deceived by its purported sale of Digital Content via its iTunes platform. The *Andino* court also rejected Apple's arguments that the plaintiff there did not plead an injury and that he failed to allege that he paid a price premium. *Id.*

Notably, upon the filing of the Complaint in this action, the online news outlet Vulture, an affiliate of Vox Media, called the instant class action a "big deal" because it seeks to cure the deceptive practices that Apple implores in its sale of Digital Content. In fact, a law school professor quoted in that article, who has devoted his academic career to studying whether the transactional language used by companies like Apple in connection with its sale of Digital Content is deceptive, stated that research conducted by him "came back with *very, very clear evidence under the kind of standards that you would need to establish in court that Apple* and Amazon

1

and companies like them were ***engaged in a massive, multibillion-dollar false-advertising scheme . . . .***"[1][2]

To be clear, the sales transaction complained of here is as straight forward as they come, which is why it is so perplexing to Plaintiffs that Apple continues to insist that it is something other than a sale of personal property.  First, it is hardly debatable that one of the primary reasons why a consumer would log onto Apple's iTunes platform is to purchase Digital Content.  Upon logging in, a consumer can only purchase that content by clicking on the "Buy" button.  After the consumer clicks on the "Buy" button, and the payment for the purchase of the content is processed, it is then moved into a "Purchased" folder.  Finally, the purchase price that a consumer pays is the price typically charged at other retail outlets for identical content (consumers can sometimes pay a purchase price that is twice as much as what other retailers charge).  Based on the above transactional components and the language used by Apple to interact with a person that logged onto iTunes for the primary purpose of buying Digital Content,  the reasonable consumer under these circumstances can only assume that she has purchased Digital Content in the same way that she would have purchased identical items at a Best Buy or Target.  In the same way that Best Buy or Target do not have the legal right to repossess the content she purchased from them, Apple should not have the right to repossess Digital Content that consumers purchased through the iTunes platform.

---

[1]  Eric Vilas-Boas, *Why Apple's Buy Button Class-Action Is a Big Deal* (Oct. 29, 2021), VULTURE, https://www.vulture.com/2021/10/apple-buy-button-class-action-lawsuit-false-advertising.html (last visited on Apr. 22, 2022).

[2]  In an undignified, and hopefully extremely rare, attack by officers of this Court on other members of the bar, Apple's counsel accuses the undersigned of profiting at the expense of Apple over the "purported confusion regarding the rights associated with Digital Content."  Def. Mot.  at p. 8, Fn. 5.  Instead of engaging in this type of behavior, perhaps a more constructive way for counsel to spend its time is to read Professor Perzanowski's studies of Apple's Digital Content sales business.  Perhaps this can be used by counsel to help its client avoid any new lawsuits, as well as the expenditure of what are probably very high attorneys' fees.

In a desperate attempt to defend itself against what could result in billions of dollars of liability in New York alone, Apple now implements a "let's throw in the kitchen sink" approach in its motion papers. However, just like in the California class action lawsuit, none of Apple's arguments can help it meet its burden on the present motion because they: (i) are not supported by any of the Complaint's well-pled allegations or applicable law, (ii) are not supported (and at times even contradicted) by the Apple Media Services Terms and Conditions that guide Apple's business (the "Terms"), (iii) lack "common sense," which ironically Apple on numerous occasions accuses that Plaintiffs (and their allegations) of lacking, (iv) were already rejected by the only court that has decided a motion to dismiss filed by Apple in a matter virtually identical to the present one, (v) require factual findings that are improper at this stage and (vi) stand in stark contrast to the positions Apple took in the California matter.

In a surprising turn of events, however, Plaintiffs have been given great news by Apple. After years of litigating these claims in a different venue, Apple has finally conceded what Plaintiffs have alleged all along is the true nature of its Digital Content sales. That is, despite the numerous representations on its iTunes platform designed to imply otherwise, Apple does not, in fact, sell any ownership rights over the Digital Content. In fact, Apple now correctly admits that it only sells a "right to use" the content (Def. Mot. at 1, 2, 14), which effectively is a license; although for some inexplicable reason it still refuses to call it by this name. *Id*. at 12.

Consumers, and the Court, may now be wondering why Apple would want to disguise what it has now admitted is a licensing transaction as a sale of that digital property. The answer is simple: it does so to maximize profits for its shareholders at the expense of its unsuspecting customers. Simply put, it is much cheaper to license Digital Content than it is to buy it from its owner for resale, which is what the typical retailer acting honestly does. Moreover, if Apple can

now sell Digital Content at "retail" prices, and pay the much cheaper licensing fee, it can achieve greater profitability.  The problem for Apple is that once the licensing agreement terminates, it is required to pull the content from the purchaser, which it does surreptitiously without ever giving any warning before the fact or notice after it, thereby exposing the ruse that misled, and continues to mislead, consumers into overpaying for Digital Content that they were deceived into believing the owned.

Despite standing accused of perpetrating the above-described deception, which is supported by the Complaint's well-pled allegations and applicable case law, Apple nonetheless moves to dismiss arguing that:1) as a matter of law reasonable consumers could not be deceived by Apple's sale of Digital Content; 2) Plaintiffs have not pled an injury or a price premium theory; and 3) the unjust enrichment claim is duplicative and/or Apple was not unjustly enriched.[3]

Defendant's motion brings to mind an adage: the definition of insanity is doing the same thing over and over again and expecting a different result.  This case is materially indistinguishable from *Andino v. Apple*, where on virtually identical facts, the court rejected the arguments Apple makes here. Yet Apple seems to believe this time will be different.  As demonstrated herein, Apple is misguided.

### **FACTUAL BACKGROUND**

I.  **Defendant Misleads Consumers Into Believing That They Are Buying Digital Content**

As alleged in the Complaint, Defendant offers Digital Content to consumers through its "iTunes" online store, which can be accessed through Defendant's app or "Apple TV" device. Comp. ¶ 31.  The manner in which Defendant offers consumers the option to "Buy" or Rent" Digital Content led, and continues to lead, reasonable consumers to believe that, when they choose

---

[3] Plaintiffs hereby withdraw their claim for injunctive relief.

to "Buy," they have purchased Digital Content for indefinite use.  Comp. ¶¶ 1-3, 31-34.  Once bought, said content instantly becomes available in the consumer's Digital Content library without the consumer needing to accept any terms and conditions pursuant to a clickwrap agreement.  The Digital Content is then stored in a folder titled "Purchased."  Comp. ¶¶ 42-47.

The purchase price charged by Defendant for Digital Content, in comparison to the lesser price it charges for a rental of the same content, further convinces consumers that they are purchasing and obtaining full ownership rights to said content.  Comp. ¶¶ 31-34.  By way of just one example, the price to "Rent" the movie Sonic the Hedgehog that Defendant was selling at the time of the filing of the Complaint is $5.99, whereas the price to "Buy" is $19.99, commensurate with the price charged for the same video on DVD format by a brick-and-mortar store, which Defendant would have to concede is not subject to repossession.  Comp. ¶ 34.  And although Plaintiff is not required to prove intent to make out his claims, Defendant's motivation to use words like "Buy" and "Purchased" can be readily discerned: Defendant would have to charge consumers considerably less money if it called the transaction something more appropriate like a "license" or "lease."  These tactics have undoubtedly allowed Defendant to make millions (perhaps even billions) of dollars in improper profits.

## II.    Defendant's Terms Do Not Cure Its Misleading Conduct

Defendant's reliance on its Terms as a defense in this action fails because Plaintiffs were not required to read, and were not put on inquiry notice of, them and the language does not even support Defendant's contention that it informed Plaintiffs that they were not actually purchasing the content.  In fact, as demonstrated below, the Terms confirm Plaintiffs' allegation at times, and other times they undermine and/or directly contradict some of the positions Apple takes here.

**III.**   <u>**Plaintiffs Were Injured by Defendant's Deceptive Conduct**</u>

As demonstrated below, the Complaint alleges that Plaintiffs: (i) bought Digital Content from Apple by clicking on a "Buy" button (Comp. ¶ 30-31, 33, 35, 38-39), which was then transferred into a "Purchased" folder (Comp. ¶¶ 42-43), (ii) were induced by Apple, through misleading labeling and advertising, to purchase, and pay premium for, Digital Content and/or enter into a transaction they otherwise would not have entered into had they known they were merely obtaining a license to purchase Digital Content from Apple Comp. ¶¶ 57, 63); (ii) believed that Defendant's use of the word "Purchased" meant that they owned the Digital Content they bought if from Apple (*id*. ¶ 44-45, 49); (iii) believed that they would have access to view (or listen to) the purchased Digital Content indefinitely *(id*. ¶ 47, 55); and (iv) were harmed by overpaying for Digital Content "purchased" from Defendant.  *Id*. ¶¶ 7, 57, 63.  These allegations state legal claims under New York's General Business Law ("GBL") §§ 349 and 350 and, accordingly, require that Apple's motion to dismiss be denied.

<u>**LEGAL STANDARD**</u>

It is well-established that "[c]laims under GBL §§ 349 and 350 are not required to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Campbell v. Whole Foods Market Grp.*, 516 F. Supp. 3d 370, 381 (S.D.N.Y. 2021) (citation omitted). Thus, to survive a Rule 12(b)(6) motion the complaint need only set forth "a short and plain statement of the claim showing that [Plaintiff] is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

When these statements are challenged, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgm*t., 843 F.3d 561, 566 (2d Cir. 2016)).  In addition, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief.'" *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 l.Ed.2d 868 (2009)).

It is equally well-established that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Iqbal*, 556 U.S. at 679. Indeed, "[b]ecause plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Lynch*, 952 F.3d at 75 (citation omitted). Consequently, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.*

As the United States Supreme Court has recognized, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Nietzke v. Williams*, 490 U.S. 319, 327 (1989).  Thus, "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recover is very remote and unlikely.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## **ARGUMENT**

### I.   **THE COMPLAINT IS SUFFICIENTLY PLED.**

#### A.   **The Standard Applicable To Causes of Action under GBL §349 and §350**

To state a cause of action under NY GBL §349 a plaintiff must plead that (1) the defendant's conduct was consumer-oriented; (2) the defendant engaged in a materially deceptive and misleading act; and (3) plaintiff was injured by the defendant's act. *Altman v. Bayer C*orp., 125 F. Supp. 2d 666, 673 (S.D.N.Y. 2000). And, to state a cause of action under NY GBL §350 a plaintiff must plead that an advertisement (1) had an impact on consumers at large; (2) was deceptive or misleading in a material way; and (3) resulted in injury. *Ackerman v. Coca-C*ola, No. 09 CV 395(DLI)(RML), 2013 WL 7044866, at *2 (E.D.N.Y. July 18, 2013) ("The Second Circuit has

held that '[t]o state as claim under  349, a plaintiff must allege that: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result").

A § 349 action is not subject to the pleading-with-particularity requirements of Rule 9(b) but need only meet the notice-pleading requirements of Rule 8(a). *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). Courts apply an objective standard in determining whether acts or practices are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 634 (2d Cir. 2018)*(*citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, NA*., 85 N.Y.2d 20, 26, 647N.E.2d 741,623 N.Y.S.2d 529 (1995)). The allegations in the Amended Complaint easily satisfy these requirements and adequately state a claim.

### B.  Apple Made Representations That Deceived Plaintiffs

Apple advances the tenuous arguments that (i) the term "Buy" is accurate and that no reasonable consumer would believe they were acquiring ownership over Digital Content (Def. Mot. at 9), and (ii) because no reasonable plaintiff under the circumstances, armed with "common sense" and a knowledge of the Terms, could ever believe that the content would be available indefinitely, Plaintiffs' claims fail as a matter of law.  Def. Mot. at 8-9.  However, as noted above, the *Andino* court rejected those arguments on identical facts.  In fact, relying on the exact definition of "Buy" that Defendant accuses Plaintiffs of selectively quoting in the Complaint, the court held that:

> But in common usage, the term 'buy' means to acquire possession over something.  Buy Definition, merriam-webster.com, https://www.meriam-webster.com/dictionary/buy (13 April 2021).  It seems plausible, at least at the motion to dismiss stage, that reasonable consumers would expect their access couldn't be revoked.

*Andino*, 2021 WL 1549667, at *4.

8

Apple cites totally inapposite cases in support of the above arguments.  Def. Mem. at 10-12.   For example, its reliance on *Kommer v. Bayer Consumer Health*, 252 F. Supp. 3d 304 (S.D.N.Y. 2017), *aff'd* 710 F. App'x 43 (2d Cir. 2018) is misplaced because the circumstances there are hardly analogous to Plaintiffs' allegations here.  In *Kommer*, the plaintiff used a drug store kiosk to help him find what orthotic best fit his feet.   *Id*. at 306.  He then alleged that the use of the kiosk misled him into believing that he was then being sold orthotics customized for his feet, except that the kiosk was only recommending that he purchase one of fourteen off-the-rack, pre-made orthotics sold through the kiosk's vendor.   The court dismissed the Complaint finding the reasonable consumer should not believe that it is being sold a custom made orthotic when, in fact, it is being recommended (by a kiosk no less) to buy an orthotic that was pre-made.  *Id*. at 311.  Those facts are a far cry from the deceptive acts that Apple undertook to convince consumers that they were purchasing Digital Content, which included using words like "Buy" and "Purchased" that are commonly used in sales transactions.

Another case that Apple relies on, *Cosgrove v. Blue Diamond Growers*, 202 WL 7211218, at *4 (S.D.N.Y. Dec. 7, 2020, (Def. Mot. at 10), is not instructive either because that case involved the interpretation of allegations that were subjective in nature, such as the taste of vanilla, versus the objective sales transaction that occurred here.  Moreover, unlike the representations examined in the rest of the cases cited by Apple (id.), which could be subject to different interpretations by different consumers, Apple's use of commonly-understood words like "Buy" and "Purchased," are hardly capable of being misunderstood by reasonable consumers.

Remarkably, while Apple finally admits that what it has been selling consumers all along is some limited "right to use," which is just another way to describe a license, it then backtracks it by saying, "[e]even accepting as true (without agreeing to or endorsing) the plaintiffs'

characterization that was sold was a 'license,' there is nothing misleading about using the word 'buy' in connection with the purchase of a license." Def. Mot. at 12-13. While it is unclear why Apple refuses to use the word "license" or any term related to it, its self-invented "right of use" can really only be one of three things: a license, lease or rental.[4] In any event, all fail to convey the ownership rights Apple misled consumers into believing they were purchasing.

Apple also relies on a slew of cases that hold that it is not misleading to use the word "Buy" in connection with the sale of a license. Def. Mot. at 12-13. These cases are irrelevant because Plaintiffs do not contend, and the Complaint does not allege, that Apple cannot sell licenses. In fact, the Complaint clearly alleges that a licensing/leasing arrangement is exactly what Apple is selling under the guise of a true sale of property. Comp. ¶¶ 6, 46, 48-49. Now that we know that Apple is selling a license, its omission of this fact from the Terms further illustrates its deceptive conduct.

And if there is any doubt about how the word "Buy" is understood in the context of online sales, Professor Aaron Perzanowski, an expert on the subject, notes the following:

> It's not as though there aren't alternatives to "buy." Perzanowski's done studies on how consumers react differently to digital storefronts when they encounter a "buy" versus "license" language, and how adding more transparency to transactions can improve customer experience. He's also noticed how newer services like Disney+ — which don't have years of customer indoctrination on a storefront to account for — eschew "buy" altogether when they introduce digital retail onto their platforms.
>
>      * * *
>
> "I got an email from Disney a while ago, and it was like 'Add these movies to your collection,'" he recalls. "A lawyer looked at this and said 'Do not use the word "b    uy." Do not use the word "purchase."' 'Add it to your digital collection' is a good way I think of avoiding the potential problem that Apple and Amazon have." He also suggests "add"

---

[4] For sure, it cannot be a "Rental" because that term is clearly defined in the iTunes environment as the ability to watch a movie for a limited number of days, after which access to it is terminated. That being the case, the only two other types of arrangements left, unless Apple can provide some other legally recognized label for this right of use, is either license or lease.

> or "save for later," as more neutral options. Apple could also replace "buy" with "get," as it has in the past. But "none of them are elegant," at least not as much as "buy."

Vilas-Boas, *supra* note 1.

Its deception now having been disclosed by its own admission, Apple cooks up yet another right that it purportedly sold consumers, which it likely does to shield itself from liability.  Def. Mot. at 11-12.  Called the right to "download," it purports to address the risk of loss of Digital Content.  *Id*. at 5-7, 14-17.  Putting aside that, as discussed below, the Terms confirm that this purported "fix" does not apply to all Digital Content sold by Apple, the right is illusory because of the number of requirements that Apple attaches to it, which make it unreasonably difficult to execute and prohibitively expensive.  Specifically, consumers wishing to "download" purchased Digital Content can only store it onto Apple products, which are typically fairly expensive. Moreover, because of the size of Digital Content files, which for each movie alone can be around five to six gigabytes, the number of Apple products necessary to house the typical content library could cost consumers thousands, if not tens of thousands, of dollars to back up this data.

 Apple's last line of defense against consumers' claims that they were unaware that they could lose purchased Digital Content comes by way of its purported set of warnings to consumers of that risk.  Def. Mot. at 16-17.  Like "downloading," this backstop is also ineffective.  First, in providing the warning, Apple misleadingly plays down the risk by stating that loss of Digital Content "is unlikely . . . . ,"  (ECF, No. 7-2 at 1), because all the content it licenses from others is subject to that risk.  Second, those warnings fall on deaf ears because, as discussed below, Plaintiffs did not have notice of them.  Indeed, the more effective way of dealing with the notice issue would have been to send a message directly to the user within a reasonable period of time prior to the prospective loss date. Apple, unfortunately, does not do that.

In further support of its argument that its use of "Buy" and "Purchased" is not deceptive, Apple makes a couple of baseless arguments about why it can only really sell a "right to use" because to do otherwise may confuse consumers into thinking that they stepped into the content creator/copyright owner's shoes.  For example, Apple argues that no reasonable consumer could expect to own the Digital Content because "it would be unreasonable to assume that paying $1.29 for one song could divest the artist of ownership of that song and those rights instead transferred exclusively and irrevocably to the" purchaser (Def. Mot. at 2, 13-14), and that such a sale could even cause consumers to believe that they could "charge licensing fees for public venues to play the song." (Def. Mot. at 14)  However, the Complaint alleges that Apple promised the type of ownership obtained when consumers purchase content in the retail sense and not ownership of the artist's copyright rights; no different than the person who buys a print of the Mona Lisa without actually owning the original painting housed in the Louvre.

Apple makes an even more ridiculous argument in the context of its sales of video content where it contends that a purchasing consumer could wrongly believe that "she has the rights of ownership in that movie," so that she can now "show it in a theater, sell figurines of the movie's characters, [and even] prevent others from watching the movie without permission."  *Id*. at 14.  Now let us just imagine a world in which a consumer can step into the shoes of George Lucas upon paying Apple $19.99 for the movie Star Wars: The Rise of Skywalker Apple sells.  Luckily for Mr. Lucas, and the countless other creators of movies and television shows, such a world only exists in Apple's motion papers.  In fact, the only way that anyone can step into his shoes is to pay billions of dollars for his copyright ownership rights, and the purchaser would not only own the video content, but would also own an extremely healthy revenue stream for the duration of the

copyright.  The above arguments being so incredulous, and wholly unsupported by any law applicable to intellectual property rights, they deserve to be rejected out of hand.

### C.  **The Terms Do Not Cure Apple's Deception**

Apple argues that the Terms dispelled any notion that it deceived consumers into believing that they were purchasing Digital Conent versus only licensing it.  Def. Mot. at 2.  Accordingly, Apple argues that this Court can find, as a matter of law at this stage, that its conduct did not mislead Plaintiffs. Unfortunately for Apple, binding caselaw on this point does not support its argument.

In *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019), the Second Circuit held that a consumer cannot be attributed notice of a website's terms and conditions unless they are presented in a clear and conspicuous way.  There the court found that knowledge of an online business's terms and conditions could not be attributed to plaintiff because the website did not call attention to the terms and conditions' hyperlink and because the hyperlink was placed out of the plaintiff' line of site, in small font, on a cluttered page.  *Id*. at 294.  Like in *Starke*, the Terms here are not called out anywhere on the portion of the webpage where the sales transaction takes place.  Also, Apple places the hyperlink to the Terms at the very bottom of the page, which would be visible to the user only if it scrolled to the very last line of the page, and the font used to label it is the smallest font on the entire page.  Accordingly, knowledge of the Terms cannot be attributed to Plaintiffs. *See also Mantikas*, 910 F.3d at 634 (holding that when consumers are faced with labeling that prominently calls out a product's key feature, the features here being "Buy" and "Purchased," the consumer need not go elsewhere on the product's labeling to confirm whether the called-out language is, in fact, true).

Not only did the Plaintiffs not have knowledge of the Terms, but even if they did, the Terms contradict many of Apple's substantive arguments.  The Terms also confirm many of Plaintiffs'

material allegations.  For example, as shown below, the Terms dispel the "boogey man" type risks Apple warned about regarding an artists' rights in its works being "irrevocably" transferred to would-be purchasers who could then turn around an exploit the work for the purchasers' benefit. Def. Mot. at 2, 13-14.

> You may use the Services or Content *only for personal, noncommercial purposes* (except as set forth in the Apple Store Content section below.  ECF 7-2, Page 2.

> Apple's delivery of Service or Content *does not transfer any commercial or promotional use rights to you*, and *does not constitute a grant or waiver of any rights other copyright owners*.  *Id*.

(emphasis added).

Clearly, the risk was invented by Apple as a scare tactic to try to shift blame away from it for having deceived consumers.

As shown below, the Terms also contradict Apple's representation that it sells consumers the right to download the Digital Content so that consumers may protect it from loss.

> Certain *Content may not be available for download at all*.  ECF 7-2, Page 4.

> You may be *limited in the amount of Content you may download*, and some *downloaded Content may expire* after a given amount of time after downloaded or first played.  *Id.*

(emphasis added).  Clearly, the "download" right Apple purports to sell really does not protect Digital Content in the way that Apple represents in its moving papers.  Thus, it appears that this is yet another right that Apple claims it sold but did not deliver.

The Terms language regarding Apple's fake Digital Content "sales" business, where we have now learned only sells "usage" rights versus the language used to describe a true licensing business like Apple Music, shed further light on Apple's deceptive conduct.  First, the Terms confirm that Apple distributes Digital Content via two different methods, one through a licensing

arrangement[5] and the other through the sales model at issue here.  Importantly, each method is exclusive to its respective business.

Through its Apple Music business, Apple licenses songs maintained in its expansive catalog of music.  ECF 7-2, Page 4.  There, consumers are provided the "right to use" that service in order to access music for listening.  Once the service is terminated, whether intentionally by the consumer or failure to pay the required monthly fee, the "right to use" the content is immediately revoked.  *Id*.  Plaintiffs agree that the content that Apple makes available via this service is merely licensed and that it only remains available for use while the consumer remains a subscriber. Importantly, Plaintiffs do not contend, and the Terms make clear, that the subscriber may never obtain any ownership rights in this content.

The second method of distribution, and the one at issue here, is Apple's sale of Digital Content whereby it leads consumer to believe that they can purchase Digital Content by clicking on a "Buy" button made available in the iTunes platform.  ECF 7-2, Page 1.  It should be noted that while the Terms describe the Apple Music in substantial detail, the Terms omit such a description about its sale of Digital Content through iTunes.  The likely reason is that such a description would likely be tantamount to confessing to having violated New York's consumer protection laws.  Indeed, a side-by-side comparison of the two business lines confirms the alleged deception.

First, Apple Music platform, clearly a product intended by Apple solely to license music, DOES NOT use the words "Buy" or "Purchased" like the product at issue here.  In fact, to access

---

[5] When it suits it, Apple is willing to describe its licensing arrangements with consumers, which is separate and apart from the sale of Digital Content through iTunes at issue here.  The following are a few examples of these: "The Services . . . may allow you to purchase access to Content [aka "right to use"] on a subscription basis . . . ." "When your Paid Subscription to any Service or Content ends, you will lose access to any functionality or Content of that Service that requires a Paid Subscription."  "App licenses are provide to you by Apple or a third party (sic) developer . . . . 7 of 15. Apps made available through the App Store are licensed, not sold, to you.  8 of 15.

music for listening all needs to do is to press a "Play" button.  Moreover, unlike the product at issue here, none of the content bears a purchase price and there is no "Purchased" folder.  Finally, on the same page where all of the above is presented, Apple provides a hyperlink that reads: "Also available in the iTunes store."  Upon clicking that hyperlink, the consumer is taken out of the Apple Music environment and placed into the iTunes platform, that is the subject of this action, where it is met with the "Buy" button and the Digital Content's purchase price.

Clearly, the above-described differences in the Apple Music service versus the iTunes service prove a few things:  Apple uses Apple Music to license Digital Content, which is why for a monthly fee (of only $9.99 for an individual), a consumer can access content by just hitting a "Play" button.  Importantly, the consumer does not have to pay a purchase price for each piece of content, and once it hits the "Play" button, the Digital Content is not transferred into a "Purchased" folders.  Conversely, Apple uses iTunes to sell, not to grant the "right to use," Digital Content because it uses words like "Buy" and "Purchased," and each piece of Digital Content has a purchase price attached to it.

Finally, Apple Music, the product that only licenses Digital Content, has a hyperlink that goes to the product that purports to allow consumers to "Buy" Digital Content for a purchase price, iTunes.  This "cross-selling" feature has the effect of signaling to consumers that they can obtain "something more" than a license over, or the mere "right to use," Digital Content from iTunes than what they are getting from Apple Music. Notably, iTunes does not cross-sell the Apple Music service.   In sum, a consumer need not be a rocket scientist to figure this one out: as explained above, Apple's iTunes service deceives consumers into believing they purchased Digital Content.

According to Apple, a Court "may consider publicly available documents and public websites," (id.) in determining whether a party's position is true.  Conversely, Apple argues that

"the Court is not required to accept as true allegations that are contradicted by documents," (Def. Mot. at p. 4, Fn. 1). Plaintiffs respectfully request that the Court reject all of Apple's arguments that are contradicted by the Terms, and accept as true all of Plaintiffs' statements that are confirmed by them, as well the information that appears on the Apple Music and iTunes platforms.

### D. **Plaintiffs Have Pled An Injury**

Apple argues that Plaintiffs have not pled that they were injured because they "did not plead a purchase." Def. Mot. at 17. Apple then argues that Plaintiffs did not aquately plead a price premium theory Def. Mot. at 19. As demonstrated below, both arguments lack any merit and should be rejected.

Under § 349 and § 350 of the GBL, a party need only "allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'" *Orlander v. Staples, Inc*., 802 F.3d 289, 302 (2d Cir. 2015); *see also Pichardo v. Only What You Need, Inc.,* No. 20-cv- 493 (VEC), 2020 WL 6323775, at *6 (S.D.N.Y. Oct. 27, 2020)("Plaintiffs have alleged that they would not have purchased the product or been willing to pay as much had they known the true facts, namely that the vanilla taste did not derive 100% from vanilla extract. This is sufficient to meet their burden of alleging injury as a result of alleged misrepresentation ." (citation omitted)); *Segedie v. Hain Celestial Grp.*, No. 14-cv-5029 (NSR), 2015 WL 60739, at *31 (S.D.N.Y. May 7, 2015) ("Plaintiffs have also adequately alleged injury by claiming that they paid a price premium that they would not have paid if the products were not labeled 'natural' or 'all natural.'"); *Mason v. Reed's Inc*., 18-cv-10826 (JGK), 2021 WL 293326, at *4-5 (S.D.N.Y. Jan. 28 2021) (finding a cognizable injury under Sections 349 and 350 of the GBL where "the plaintiff allege[d] injury in that she paid a price premium for the product that she thought was all natural and without preservatives").

In arguing that Plaintiffs have not pled a purchase, Apple effectively asks the Court to

apply a Rule 9(b) pleading standard that is not applicable in GBL cases.  Def. Mot. at p. 18.  As demonstrated below, Plaintiffs have, in fact, pled their injury with sufficient specificity to provide Apple with notice of their claims so that it may be able to mount a defense against them.  Further proof of that is evident by the fact that the *Andino* court found that the plaintiff there had met the more stringent Rule 9(b) pleading standard on allegations identical to the present ones.  2021 WL 1549667 at *3-4.

The fact is that Plaintiffs have pled facts on their behalf and on behalf of the tens of millions of class members with sufficient specificity to provide it notice of the claim against it "and the grounds upon which it rests," *Twombly*, 550 U.S. at 555, which is all that is required at this stage. Indeed, Plaintiffs pled that (i) Apple misled consumers into believing that it was selling them Digital Content that it was only licensing them; (ii) the Digital Content came in the form of movies, television shows and music and (iii) movies were sold for up to $19.99 each, television shows for around $3.99 per episode and songs were sold for around $1.29 each.  In addition, Apple's argument to the contrary, Plaintiffs are not required at the pleading stage to allege how much they paid for the Product.  *Goldemberg v. Johnson & Johnson Consumer Companies Inc.*, 8 F. Supp. 3d 467, 481-82 (S.D.N.Y. 2014)(failure to identify prices of competing products in the complaint is not fatal to plaintiff's claims).

Apple also argues that Plaintiffs did not plead an injury because they did not plead that they lost any Digital Content.  This argument is based on Apple's improper reading of the Complaint and, thus, misses the mark.  In fact, nowhere in the Complaint do Plaintiffs allege that they seek damages for loss content.  The only damages Plaintiffs claimed they suffered are in the form of the overpayment of the Digital Content's purchase price due to Apple's misleading conduct that it was selling Digital Content even though it was only providing a license to it.  Comp.

¶ at 7, 57, 63.  As described below, Plaintiffs handily plead a price premium theory and, accordingly, have pled an injury. [6]

Apple's other argument, that Plaintiffs failed to provide the prices of comparable products is misplaced because any "comparable" product would need to have been misrepresented by its manufacture and/or seller; making finding such products virtually impossible.  *See Axon v. Florida's Natural Growers*, 813 F. App'x 701, 704 (2d Cir. 2020) ("Axon's failure to identify the prices of competing products to establish a premium that she paid 'is not fatal to [her] claim' at this stage of the proceeding); *see also Valcarcel v. Ahold U.S.A. Inc.*, No. 21-*cv-07821 (JSR) 2021 WL 6106209, at *7 (S.D.N.Y. Dec. 22, 2021) (rejecting argument that "conclusory" allegations regarding the price premium are inadequate).

In arguing that Plaintiffs have not pled a price premium theory, which confirms that it does understand that this is a "price premium" case versus a "lost content" case, Apple improperly contends that Plaintiffs "got the full value of what they bought: the right to use (watch and listen to) and to download the Digital Content." Def. Mem. at 27.  Nothing could be further from the truth since Apple never represented either on the iTunes platform or in the Terms that it was merely selling Plaintiffs a "right to use" Digital Content.

While Apple then goes on to concede that "[a] well pleaded allegation that a plaintiff paid a premium may be sufficient to allege injury," it concludes that the Complaint's allegations fail in this regard because Plaintiffs only made conclusory assertions that the Digital Content was sold at a premium without providing any facts that support this supposition."  Def. Mot. at 20-21.  This

---

[6] Apple's other argument, that Plaintiffs' allegations do not permit it to determine which version of the Terms applied to Plaintiffs purchases also fail for several reasons.  First, as discussed above, Plaintiffs were not required to review Apple's Terms pursuant to the Second Circuit's holding in *Starke* and *Mantikas*.  Second, if the differences in Terms ever becomes relevant, surely Apple must possess all of Plaintiffs' purchase records, including the dates when they purchased Digital Content and could easily use those to defend itself against the Complaint's allegations.

argument is belied by the Complaint's well-pled allegations.  First, the Complaint alleged that most of the Digital Content that Apple sells is licensed from the content's owners.  Comp. Para. 4. Accordingly, Apple cannot pass title to most Digital Content it sells unlike a Best Buy or Target that actually can and does.  *Id*.  The Complaint also alleged that despite the above-described temporary licensing arrangement, Apple still charged just as much for Digital Content as would have been charged by Best Buy or Target, except the that Best Buy/Target content will remain with the purchaser indefinitely.  Comp ¶ 5.  Finally, the Complaint concludes that if Apple had called the transaction what it really was, some type of licensing arrangement, it could not charge nearly as much as it was able to charge for the Digital Content by misrepresenting to consumers that it was a "sale." *Id*. ¶¶ 5-7.  Thus, the price premium paid here was the difference between the purchase price by Plaintiffs to obtain the rights of ownership in Digital Content versus the lower-valued license it received instead.  As demonstrated above, the Complaint alleged Plaintiffs' price premium theory adequately and in a non-conclusory manner.  *See also* Comp Para. 7 (alleging a price premium equal to the "overpayment of content" that the purchaser "can never own").

Defendant's reliance on *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 143 (E.D.N.Y. 2018) and *Izquierdo v. Mondelez International Inc*., No. 16-cv-04697, 2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016), is misplaced because both are distinguishable from the present matter.  In *Colella*, this Court found that no price premium was alleged because the plaintiff did not allege where he purchased the products, when he purchased the products and what he paid for the products.  348 F. Supp. 3d at 143.  However, the Complaint here alleges that Digital Content was bought through Apple's iTunes platform during the class period and provides the approximate price for each type of content sold by Apple.  Importantly, unlike the plaintiff in *Collela*, who purchased Atkins products from retail stores that were not affiliated with the defendant, Plaintiffs

will be able to obtain information related to their purchases from Apple through discovery.

In *Izquierdo*, the plaintiffs "did not allege[] that they paid a higher price of the Candy than they otherwise would have, absent deceptive acts." 2016 WL 6459832, at *7.  As described above in detail, the Complaint clearly provided allegations that Plaintiffs paid a higher price than they would have had Apple not misrepresented a license as a sale of content.  Thus, Apple's assertion that Plaintiffs only make "conclusory asserts that the 'Digital content is sold at a premium price . . . ,'" (Def. Mem. at 21) is wrong.  Accordingly, Plaintiffs have adequately pled a price premium theory.

## II.   **PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS ALLOWED AS NON-DUPLICATIVE**

Defendant argues that Plaintiff's unjust enrichment claim must be dismissed as duplicative of his GBL §§ 349 and 350 claims.  Def. Mot. at 21-22.  Defendant's position is wrong. Plaintiffs' unjust enrichment claim ***is not*** duplicative of the GBL §§ 349 and 350 claims. As explained in *Acquard v. Big Heart Pet Brands Inc.*, 2020 WL 12904361 (W.D.N.Y. Nov. 30, 2020):

> Plaintiffs' unjust enrichment claim is not duplicative, because Plaintiffs' other claims – under New York General Business Law…– require proof of an element that is distinct from what is required to prove unjust enrichment. *Nuss v. Sabad*, No. 7:10-cv-0279-LEK-TWD, 2016 WL 4098606, at *11 (N.D.N.Y. July 28, 2016) (holding that an unjust enrichment claim is not duplicative if a "reasonable trier of fact could find unjust enrichment ... without establishing all the elements for one of [Plaintiffs'] claims sounding in law"). For example, to prevail under New York General Business Law § 349, a plaintiff must show '[p]roof that [a] defendant's acts are directed to consumers,'" while a claim for unjust enrichment does not require such a showing. *McCracken v. Verisma Sys., Inc.*, No. 6:14-cv-06248-MAT, 2017 WL 2080279, at *8 (W.D.N.Y. May 15, 2017); *Cty. of Nassau v. Expedia, Inc.*, 992 N.Y.S.2d 293, 296 (N.Y. App. Div. 2014) (setting forth the elements of unjust enrichment as: (1) enrichment of the defendant; (2) at the plaintiff's expense; (3) the retention of which by the defendant is against equity and good conscience). Thus, "a reasonable trier of fact could find the elements [of] unjust enrichment without establishing all the elements for Plaintiffs' NYGBL § 349 claim." *Id.; see also Warner v. StarKist Co.*, No. 1:18-cv-406-GLS-ATB, 2019 WL 1332573, at *3 (N.D.N.Y. Mar. 25, 2019) (observing that "[t]he elements for an unjust enrichment claim are distinct from the elements for GBL claims under §§ 349 and 350").

*Acquard*, 2020 WL 12904361, at *7.

In *Acquard*, just as here, deceptive labeling claims were pled both for violation of GBL §§ 349/350 and for unjust enrichment.

In addition to the differences between GBL claims and unjust enrichment discussed above by the court in *Acquard*, the measure of recoveries for a violation of GBL §§ 349/350 and for unjust enrichment are significantly different. Plaintiff here seeks ***statutory damages*** of $50 for Defendant's violation of GBL §349 and $500 for its violation of GBL §350.

In sharp contrast, with respect to his unjust enrichment claim, however, Plaintiffs seek ***restitution***. *See* Comp. ¶¶ 68, 82 ("As a result of Defendant's recurring, 'unlawful' deceptive acts and practices, Plaintiffs and the Class members are entitled to monetary and compensatory damages, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct . . . ."). It goes without saying that restitution differs from an award of statutory damages, as it is based upon the price premium that consumers paid for products. *See e.g. Chang v. Fage USA Dairy Industry, Inc.,* 2016 WL 5415678, *10 (E.D.N.Y. Sept. 28, 2016) ("Thus, where a monetary award seeks to restore a plaintiff's property that the defendant obtained using unlawful means, even where that property is money, it is "a restitutionary remedy" and "not one for payment of damages…. Here, Plaintiffs seek to restore the money Defendant acquired using allegedly unlawful means, and thus seek a "restitutionary" remedy. While such a remedy may overlap with a damages award… they are distinct remedies.").

## III.   <u>NONMUTUAL OFFENSIVE ISSUE PRECLUSION</u>

"Nonmutual offensive collateral estoppel, a form of issue preclusion, 'preclude[s] a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff.'" *Biflock v. Philip Morris USA, Inc.*, 936 F.3d 74, 79 (2d Cir. 2019).

> To invoke this doctrine, a plaintiff must satisfy four conditions: (1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, and (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Id.* at 79-80.

Finally, if the four prongs are met, the Court must determine whether application of the doctrine would be fair. *Id.* at 80.

The first prong, identicality, is not concerned with "'claims or . . .causes of action as a whole,' but with *issues*—'single, certain and material point[s] arising out of the allegations and contentions of the parties.'" *Id.* (modifications and emphasis in original) (citation omitted). Importantly, "the identicality standard does not require either that the two cases have the same scope or that they involve the same causes of action." *Id.* at 82. "Rather, it is met, as here, so long as the *issues* are identical." *Id.* (emphasis in original).

Here, the identicality prong is met on the issue of whether the terms "Buy" or "Purchase" could deceive a reasonable consumer. It is well settled that whether a reasonable consumer would be deceived is an objective question of fact. *See Mantikas*, 910 F.3d at 636 (applying standard to both New York and California law). In *Andino*, Apple argued, just as they do here, that a reasonable consumer could not be deceived by the words "Buy" or "Purchase" into believing the material would remain on the iTunes platform indefinitely. *See Andino*, at *4. But the *Andino* court rejected this, citing the Merriam-Webster definition of "buy" to mean acquiring possession over. *Id.* Apple, again, makes the same argument that a reasonable consumer would not understand the terms to mean a person takes possession of the item, seeking to parse the very definition the *Andino* court relied on. *See* Def. Mot. at 11.

In *Andino*, "Apple also argue[d] that because a user can download purchased content for full and irrevocable access, the 'Bury' and "purchased language is accurate." *See Andino*, at *4. Apple makes the same argument here that "the plaintiffs could not reasonably have believed that the Digital Content 'would be available for viewing and/or listening indefinitely' because common sense and the Terms put them on notice that they should download purchased Digital Content to avoid losing access." *See* Def. Mot. at 9; *see also* at 16. Thus, this issue is also identical.

The remaining prongs are easily established: the issues were litigated and decided by the *Andino* court, Apple had a full opportunity to fully litigate the issues, and the issues were central to its Rule 12(b)(6) argument as to why the claim failed as a matter of law and were thus necessary.

Having satisfied the four prongs, the remaining question is whether application of the doctrine would be fair. *Biflock*, 936 F.3d at 84. There is no catalog of factors, but the courts often look at "whether 'the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of defendants,' and whether 'the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* (citations omitted). The answer to both of these is no. The *Andino* decision was the only one to directly address these issues for Apple, and Apple moved—as it does here— for dismissal under the same Federal Rule of Civil Procedure.

"Other factors include whether [sic] 'the defendant had little to no incentive to raise [the issue] in the earlier action,' and whether the underlying case was tried before a jury or a judge sitting as a trier of fact." *Id.* Apple had every incentive to, and did, raise the issue in the *Andino* motion to dismiss, to which the judge declined to strip the issue from the trier of fact.

Finally, courts also look to whether application of collateral estoppel would increase the efficiency of proceedings. *Id.* To this, the answer is clearly yes, as the parties would not be required

to relitigate an issue that has been previously decided. On the flipside, if the Court were to take up the issue, and decide differently than the *Andino* court, it would create conflicting opinions. Specifically, if the Court were to say the terms could not deceive a consumer as a matter of law, that may well cause re-litigation of the issue in *Andino* thereby necessitating the further expenditure of judicial and party resources.

At base, Apple fully litigated this issue before a sister court in the California, and that court ruled that these issues could not be decided as a matter of law. If there is any inequity, it is in giving Apple another bite at the apple.

## IV.   RULE 15 MANDATES THAT LEAVE TO REPLEAD SHOULD BE GIVEN FREELY

Federal Rule of Civil Procedure 15 mandates that courts "should freely give leave" to amend in the early stages of litigation "when justice so requires." Fed. R. Civ. P. 15(a)(2). This permissive standard is consistent with the Second Circuit's "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.")). Accordingly, if the Court finds that any part of the Amended Complaint is insufficient, Plaintiff respectfully requests that he be allowed to replead to address the insufficiency.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion or in the alternative grant leave to file a Second Amended Complaint.

Date: April 22, 2022                         Respectfully submitted,

                                                  **REESE LLP**

                                                  */s/ Carlos F. Ramirez*
Michael R. Reese
Carlos F. Ramirez
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Email: mreese@reesellp.com
Email: cramirez@reesellp.com

**REESE LLP**
Charles D. Moore
100 South 5th Street, Suite 1900
Minneapolis, Minnesota 55402
Telephone: 701-3907214
Email: *cmoore@reesellp.com*

*Attorneys for Plaintiff and the Proposed Class*